1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    GAILLEEN E. SCHMIDT,                              No.  2:12-cv-00016-KJN

12                        Plaintiff,

13           v.                                         ORDER

14    CAROLYN W. COLVIN, Commissioner
      of Social Security,

15
                          Defendant.
16

17

18           Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19    ("Commissioner") denying plaintiff's application for Supplemental Security Income under Title

20    XVI of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff contends

21    that the Commissioner erred by finding that plaintiff was not disabled from May 1, 1991, through

22    the date of the final administrative decision.  (Mot. for Summ. J., ECF No 17-1 at 2.)  The

23    Commissioner filed an Opposition to plaintiff's motion, as well as a cross-motion for summary

24    judgment.  (Opp'n, ECF No. 21.)  Plaintiff filed a Reply in support of her motion.  (Reply, ECF

25    No. 23.)

26

27    ---
      [1]    This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and 28
      U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
28    Magistrate Judge.  (ECF Nos. 12, 22.)

For the reasons that follow, the court denies plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment for the Commissioner.

I.       BACKGROUND

Plaintiff's highest degree of education is two years of college completed in 1982.  (Mot. for Summ. J. at 2 (citing Administrative Transcript ("AT") 175).)  Her previous work experience includes employment as a care provider from 2006 to 2008, though only for five hours per week.  (Id. (citing AT 171).)

On November 12, 2008, plaintiff applied for benefits, alleging that she was unable to work as of May 1, 1991.  (Id. (citing AT 165).)  On January 29, 2009, the Commissioner determined that plaintiff was not disabled.  (Id. (citing AT 83).)  Following plaintiff's request for reconsideration, the agency affirmed the determination on June 12, 2009.  (Id. (citing AT 87).)  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing occurred on March 30, 2010.  (Id. (citing AT 47).)  Non-attorney Steven Skinner represented plaintiff at the hearing.  (Id.)

In a decision dated July 16, 2010, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from May 1, 1991, through the date of the decision.  (Id. (citing AT 15-31).)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on June 28, 2011.  (Id. (citing AT 10-12).)  On January 3, 2012, and pursuant to an extension of time, plaintiff filed this action for judicial review of the Commissioner's final decision.  (Id. (citing AT 1-2); Compl., ECF No. 1.)

II.      PLAINTIFF'S ARGUMENTS

Plaintiff argues that the ALJ improperly discredited plaintiff's testimony regarding her symptoms and functional limitations.  (Mot. for Summ. J. at 8.)  Plaintiff also contends that the ALJ rendered an improper RFC determination and an improper Step 5 determination.  (Id.)

III.     LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether: (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record

2

1   as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial

2   evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340

3   F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable

4   mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th

5   Cir. 2007) (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  "The ALJ is

6   responsible for determining credibility, resolving conflicts in medical testimony, and resolving

7   ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

8   "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

9   rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

10  IV.     DISCUSSION

11          A.  Summary of the ALJ's Findings

12          The ALJ evaluated plaintiff's entitlement to benefits pursuant to the Commissioner's

13  standard five-step analytical framework.[2]  At the first step, the ALJ concluded that plaintiff had

---

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment . . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled.  If not, proceed to step two.

> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If

1   not engaged in substantial gainful activity since November 12, 2008, the application date.  (AT

2   20.)

3        At step two, the ALJ determined that plaintiff had the following severe impairments:

4   "musculoskeletal limitations secondary to back, arthritis, Parkinson's disease, asthma,

5   posttraumatic stress disorder, and adjustment disorder with anxiety and depression."  (Id.)

6        At step three, the ALJ determined that plaintiff did not have an impairment or

7   combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part

8   404, Subpart P, Appendix 1.  (Id.)

9        Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows: "[T]he

10   claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R.

11   404.1567(c) except claimant is limited to simple unskilled work."  (AT 21.)

12        The ALJ considered the "entire record" in rendering his RFC assessment, including the

13   medical opinion evidence of record.  (AT 21-26.)  There was no treating physician's opinion in

14   the record; the ALJ gave "significant weight" to all opinions from the examining and non-

15   examining physicians of record.  (AT 25.)

16        With respect to medical opinion evidence relating to plaintiff's exertional limitations, the

17   ALJ explained,

18           [t]he undersigned accepted the determinations of the state agency
             physicians who acknowledge finding [] mild degenerative disc
19           disease of the lumbar spine as well as mild right carpal tunnel
             syndrome, multiple joint pains, and limited the claimant to medium
20           work.  [Citation to AT 205-11.]  The undersigned agrees with this
             assessment and finds the claimant retains at least the ability to
21           perform medium work.

22   (Id.)

23   ////

24   _____

25           not, the claimant is disabled.

26   Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

27        The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
28   evaluation process proceeds to step five.  Id.

1    With respect to medical opinion evidence relating to plaintiff's non-exertional limitations,

2  the ALJ explained that while plaintiff "may have difficulty performing detailed or complex

3  tasks[,] the undersigned concludes that claimant still retains the ability to perform simple

4  unskilled work." (AT 25-26.) The ALJ concluded, "despite some slight opinion variations, no

5  examining or non-examining physician has suggested that the claimant has preclusions from

6  performing a range of medium work with limitations to simple unskilled work." (Id.)

7    The ALJ relied on several medical opinions in rendering his RFC assessment. Those

8  medical opinions, and the ALJ's determinations thereon, are described below.

9    a.  Dr. Cormier's Opinions

10    Dr. Cormier, Ph.D, a consultative examining psychologist, first examined plaintiff on

11  January 9, 2009. (AT 280-84.) As the ALJ noted, Dr. Cormier interviewed plaintiff, took her

12  history, and administered several diagnostic tests. (AT 24, 281-83.) As the ALJ explained, Dr.

13  Cormier diagnosed plaintiff with "Adjustment Disorder with Anxiety and Depression, personality

14  and developmental disorders." (AT 24, 282-83.) The ALJ accurately described Dr. Cormier's

15  assessment of plaintiff's current Global Assessment of Functioning[3] ("GAF") score as "55."[4]

16  (AT 24, 283.)

17  ////

---

[3] A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, at 32 (Am. Psychiatric Ass'n 4th ed. 2000) ("DSM-IV"). "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1160 n.2 (9th Cir. 2012) (quoting Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)). GAF Scores range from 1–100. DSM -IV at 32. In arriving at a GAF Score, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. DSM-IV at 34. A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id.

[4] Dr. Cormier noted that plaintiff's GAF score had been "75" in the past year. (AT 283.)

With respect to plaintiff's functional limitations, Dr. Cormier opined that "the ramifications of this woman's significant adjustment disorder are likely to moderately to seriously impair her current ability to perform not only complex and detailed tasks, but simple and repetitive ones as well." (AT 283.) The ALJ reiterated Dr. Cormier's opinion regarding plaintiff's "moderate[] to serious[]" limitations on ability to perform simple and repetitive tasks. (AT 24.) The ALJ also reiterated Dr. Cormier's opinion that plaintiff demonstrated "moderate impairment regarding persistence but not pace." (AT 24, 283.) Dr. Cormier also opined that plaintiff's "history and interview behavior did not necessarily suggest [any] impairment regarding her current ability to interact with coworkers or the general public," and the ALJ reiterated this as well. (AT 24, 283.)

Dr. Cormier also opined that, "I suspect that her significant adjustment disorder with anxiety and depression may impair her ability to maintain regular attendance and perform work activities on a consistent basis," and that "[h]er ability to complete a normal workday or workweek without interruptions resulting from her adjustment disorder appears moderately to seriously impair[ed] at the present time." (AT 283.) Dr. Cormier opined that plaintiff's "response to the stress of the examination" suggests plaintiff likely has an "impaired" ability to deal with stresses in a competitive work situation. (Id.)

After describing plaintiff's functional limitations, however, Dr. Cormier concluded his opinion with the following sentence: "I suspect that her functional status may significantly improve within the next few months with continuing counseling and pharmacological treatment, given the recentcy [sic] of her losses of her mother and sister." (Id.)

The ALJ gave "significant weight" to Dr. Cormier's opinion, and emphasized Dr. Cormier's findings that plaintiff "was capable of performing basically all activities of daily living" and that she had no limitations on her ability to interact with co-workers and the general public. (AT 24-25, 283.) The ALJ also emphasized that, "[m]oreover, Dr. Cormier[] suspected that [plaintiff's] functional status would significantly improve within the next few months with continued counseling and pharmacological treatment, given the recency [sic] of her losses of her mother and sister." (AT 24, 283.)

6

Dr. Cormier conducted a supplemental examination of the plaintiff a week after the first examination, according to the notes of Dr. Koretzky, a non-examining physician.[5]  (AT 305.)  Dr. Cormier's supplemental examination revealed that plaintiff's functional limitations had significantly improved, that her mental test results were unremarkable, and that plaintiff had "mild" impairments.  (AT 305.)

    b.   Dr. Koretzky's Opinion

Dr. Koretzky, a non-examining state agency physician, reviewed the medical evidence of record on January 26, 2009.  (AT 305-23.)  Dr. Koretzky noted that, a week after Dr. Cormier's first examination, his supplemental examination revealed that plaintiff's GAF score was "60" and that her "functional status seemed significantly better which was attributed to improvement in her adjustment disorder."  (AT 305.)  Dr. Koretzky opined, "[plaintiff] is capable of completing simple tasks, getting along with coworkers and supervisors and adapting to changes."  (AT 305.)  He also found that she had "moderate" limitations on her ability to "maintain[] concentration, persistence, or pace," her "ability to understand and remember detailed instructions," her "ability to maintain attention and concentration for extended periods," her "ability to complete a normal workday and workweek . . . and to perform at a consistent pace," and her "ability to respond appropriately to changes in the work setting."  (AT 316, 320-21.)  The ALJ gave "significant weight" to Dr. Koretzky's opinion.  (AT 24.)

    c.   Dr. Wirganowiz's Opinion

Dr. Wirganowiz, a consultative examining physician, conducted a complete orthopedic evaluation on January 10, 2009.  (AT 287-92.)  After taking plaintiff's history, Dr. Wirganowiz conducted various physical examinations and found among other things that plaintiff's lumbar

---

[5]   Dr. Cormier's supplemental examination report — which describes "significant improvement" in plaintiff's functional limitations — does not itself appear in the certified administrative record, but as defendant argues, "inasmuch as Dr. Koretzky's summary is part of the record, [his summary of Dr. Cormier's supplemental examination] can properly be considered as part of the record 'as a whole.'"  (Opp'n at 12 n.7.)  Plaintiff offered no refutation of this position in her reply brief, and she did not object to the use of evidence in the form of Dr. Koretzky's summary of Dr. Cormier's supplemental examination (AT 305).  Accordingly, the undersigned has considered such evidence.

1   spine had only a "limited" range of motion and that plaintiff suffered "joint pains." (AT 290-91.)

2   "Nevertheless," as to plaintiff's functional limitations, Dr. Wirganowiz opined that plaintiff

3   "should be able to lift 25 lbs. frequently or 50 lbs. on an occasional basis.  She should be able to

4   sit, stand, or walk for a duration of 6 hours in a normal workday with appropriate breaks.  She

5   does not require the use of assistive devices for ambulation.  Claimant may use the upper

6   extremities for gross motor and fine manipulative movements." (AT 22, 291.)

7        In his decision, the ALJ discussed Dr. Wirganowiz's findings and emphasized that Dr.

8   Wirganowiz "concluded nevertheless that" plaintiff retained these functional abilities *despite* her

9   multiple joint pains and "mild carpal tunnel syndrome" in her right arm.  (AT 22-23.)  The ALJ

10  gave "significant weight" to Dr. Wirganowiz's opinion.  (AT 25.)

11        d.  Dr. Tambellini's Opinion

12        Dr. Tambellini, a non-examining state agency physician, reviewed the medical evidence

13  of record on January 23, 2009.  Based upon that review, he concluded that plaintiff was able to

14  perform work requiring her to lift 50 pounds occasionally, 25 pounds frequently, and stand or

15  walk with normal breaks for a total of about 6 hours in an 8-hour work day.  (AT 300.)  Dr.

16  Tambellini agreed with the findings of the examining physicians whose evidence he had

17  reviewed.  (AT 303.)  The ALJ described Dr. Tambellini's findings and gave "significant weight"

18  to Dr. Tambellini's opinion.  (AT 25.)

19        At step four, the ALJ found that plaintiff was unable to perform her past relevant work as

20  a home health aide because that work was "semi-skilled," yet plaintiff's RFC limited her to

21  "simple unskilled work."  (AT 26.)

22        At step five, the ALJ considered plaintiff's age, education, work experience and RFC and

23  found that she can perform jobs that exist in significant numbers in the national economy.  (AT

24  27.)  The ALJ looked to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,

25  Appendix 2.  (Id.)  The ALJ concluded that, while plaintiff lacks the RFC to perform the "full

26  range" of "medium work," her "additional limitations" render her able to do "simple unskilled"

27  work and "have little or no effect on the occupational base of unskilled medium work," such that

28  a finding of "not disabled" is appropriate.  (AT 27.)

8

B. <u>Substantial Evidence Supports The ALJ's Adverse Credibility Determination</u>

In <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028 (9th Cir. 2007), the Ninth Circuit Court of

Appeals summarized the ALJ's task with respect to assessing a claimant's credibility:

> To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.  Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged.
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so . . . .

<u>Lingenfelter</u>, 504 F.3d at 1035-36 (citations and quotation marks omitted).  An ALJ must give

"specific, clear and convincing reasons" in rendering an adverse credibility determination.

<u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (explaining that if the claimant satisfies

step one and "there is no evidence of malingering, then the ALJ must give specific, clear and

convincing reasons in order to reject the claimant's testimony about the severity of symptoms.")

(internal quotation marks omitted).  "At the same time, the ALJ is not required to believe every

allegation of disabling pain, or else disability benefits would be available for the asking . . . ."  <u>Id.</u>

"The ALJ must specifically identify what testimony is credible and what testimony undermines

the claimant's complaints."  <u>Valentine v. Comm'r of Soc. Sec. Admin.</u>, 574 F.3d 685, 693 (9th

Cir. 2009) (quoting <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999)).

In weighing a claimant's credibility, an ALJ may consider, among other things, the

"'[claimant's] reputation for truthfulness, inconsistencies either in [the claimant's] testimony or

between [her] testimony and [her] conduct, [the claimant's] daily activities, [her] work record,

and testimony from physicians and third parties concerning the nature, severity, and effect of the

symptoms of which [the claimant] complains.'"  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th

1   Cir. 2002) (modification in original) (quoting <u>Light v. Comm'r of Soc. Sec. Admin.</u>, 119 F.3d

2   789, 792 (9th Cir. 1997)).  If the ALJ's credibility finding is supported by substantial evidence in

3   the record, the court "may not engage in second-guessing."  <u>Id.</u> at 959.

4                    a.   <u>Plaintiff Has Not Shown That The Form Of The ALJ's Decision Should Be</u>

5                         <u>Taken Over Its Content</u>

6          Plaintiff argues that she testified "that she was previously found disabled under SSI before

7   her prior marriage rendered her financially ineligible for benefits, [and] that she currently could

8   not work because of her mental impairments that caused confusion, thinking problems, weight

9   loss, tiredness, sleeping problems, and injuries to her dominant right hand."  (<u>Id.</u> at 9-10 (citing

10  AT 49, 69-70).)  She argues that she gave testimony supporting occasional discomfort in her right

11  hand, as well as numbness in both hands.  (<u>Id.</u> at 10 (citing AT 287).)

12         Plaintiff argues that the ALJ improperly discredited plaintiff's testimony by "failing to

13  explain why Plaintiff's testimony was not credible."  (Mot. for Summ. J. at 9.)  Plaintiff argues

14  that "the ALJ never specifically addressed why he found [plaintiff's] testimony to be incredible.

15  [Citation.]  Rather, the ALJ only listed objective medical evidence prior to his credibility

16  determination (AT 22-25), and never explained why the evidence would convincingly dismiss

17  plaintiff's credibility."  (<u>Id.</u> at 11 (citation omitted).)  Plaintiff's argument is essentially that the

18  ALJ erred in explaining reasons for his adverse credibility determination *after* having written the

19  adverse credibility determination.  The argument is not well-taken.

20         Plaintiff's argument that the form of the ALJ's decision improperly "conflates" the

21  credibility analysis with the ALJ's RFC determination is not compellingly supported with

22  citations to authorities and is belied by the content of the ALJ's decision.  (Mot. for Summ. J. at

23  12; Reply at 2 ("all of [the ALJ's] rationales were from the RFC analysis on R. 26, which is

24  wholly separate from the credibility analysis.").)  Here, the ALJ rendered his adverse credibility

25  determination (AT 25) and then explained the reasons he rendered it, including citations to the

26  evidence of record (AT 26).  Given that plaintiff has not provided authority requiring him to do

27  otherwise, the undersigned reviews the ALJ's decision for its content and for whether the

28  ////

evidence of record supports it, not for its form.[6]  Contrary to plaintiff's reading of the ALJ's

decision, the ALJ gave several specific, record-supported reasons for rendering his adverse

credibility determination (AT 25-26), and those reasons are described below.

### b.  The ALJ Properly Determined That Plaintiff's "Scant Treatment" Undermined Her Credibility

The ALJ discredited plaintiff's testimony due in part to the "scant treatment" of her

alleged disabling impairments.  (AT 26.)  As the ALJ explained, "the record shows scant

treatment for her complaints of alleged disabling impairments.  In fact, there is no significant

mention or treatment for complaints of asthma, Parkinson's disease, kidney problems, skin cancer

or migraines."  (AT 26.)  The ALJ noted that plaintiff had not received treatment for knee

abnormalities or "ongoing inflammation" of joints.  (AT 26.)

A claimant's relatively conservative treatment is a proper consideration in an ALJ's

credibility determination.  Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of

treatment in his credibility determination."); Tommasetti, 533 F.3d at 1039-40 (reasoning that a

favorable response to conservative treatment undermines complaints of disabling symptoms);

Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence

of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an

impairment."); Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (ALJ properly discredited

claimant's allegations of "persistent and increasingly severe pain and discomfort over a period of

---

[6]  Plaintiff cites to Smolen to support the argument that "conflating the RFC analysis" and the credibility analysis "would necessarily run counter to the specific, clear, and convincing reason requirement in dismissing plaintiff's testimony."  (Reply at 2, Mot. for Summ. J. at 11 (citing Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).)  However, plaintiff does not meaningfully apply Smolen to the facts of this case.  The Smolen case does not speak to any required structure of the ALJ's decision.  See Smolen, 80 F.3d at 1281-82 (holding that the ALJ erred by discussing evidence of some, but not all, of the plaintiff's medical impairments, and by rejecting the plaintiff's symptom testimony for lack of corroborating medical evidence).  Without more, the undersigned declines to read Smolen as requiring an ALJ to discuss evidence supporting his credibility determination separately from evidence supporting his RFC determination lest he or she risk "conflating" the two analyses.  See id.  Instead, Smolen clarifies that the "ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion," with no mention of where in the ALJ's decision such statements must occur.  Id. at 1284.

1   many years" when claimant "denied having received more than rather minimal conservative

2   treatment for his various complaints") (internal quotation marks omitted).

3        Here, the undersigned's review of the record does not indicate that the ALJ erroneously

4   overlooked significant treatment of any particular condition.  The medical evidence supports the

5   ALJ's determination that the record reveals a lack of significant treatment for symptoms that

6   plaintiff described as totally disabling.  (AT 26.)  For instance, as the ALJ accurately explained in

7   describing the medical treatment evidence of record, plaintiff was "given routine and conservative

8   care" for "anxiety and depression" in 2008, and she was "not referred to a specialist nor needed

9   hospitalization or emergency treatment."  (AT 23 (citing 236-79).)  The ALJ also accurately

10  noted that plaintiff "was given routine and conservative treatment" in 2009, and that she "did not

11  complain of back problems, arthritis, Parkinson's disease, or asthma."  (AT 23 (citing 336-41).)

12  In any event, plaintiff has not identified any portions of the record indicating significant

13  "treatment" of the conditions she contends render her functionally unable to work, and the

14  record's lack of a treating physician's opinion does not help the matter.

15       Plaintiff also suggests the ALJ erred in "concluding that Plaintiff had severe impairments

16  of Parkinson's disease and asthma" at step two, yet "revers[ing] course" in rendering his adverse

17  credibility determination and finding there was "no significant mention or treatment for

18  complaints of asthma, Parkinson's disease, kidney problems, skin cancer or migraines."  (Reply at

19  2-3.)  However, plaintiff has not cited any authorities on this point, and has not shown that an

20  ALJ who finds impairments to be "severe" at step two necessarily errs by also finding that a lack

21  of treatment of such impairments supports an adverse credibility determination.  Cf. Hoopai v.

22  Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007) (explaining that a finding of "severe" at step two

23  does not necessarily require consistent similar findings at the remaining steps of the analysis, and

24  explaining that "[t]he regulations guiding the step-two determination of whether a disability is

25  severe is merely a *threshold determination* of whether the claimant is able to perform his past

26  work.  Thus, a finding that a claimant is severe at step two only raises a prima facie case of a

27  disability.") (emphasis added)).

28  ////

1   Accordingly, the ALJ properly considered plaintiff's scant treatment in evaluating

2   plaintiff's allegations of disabling symptoms.  See Tommasetti, 533 F.3d at 1039-40; Parra, 481

3   F.3d at 751; Fair, 885 F.2d at 604.  The ALJ relied in part upon such lack of treatment as one of

4   the several reasons he gave for discounting plaintiff's testimony, and plaintiff has not shown the

5   ALJ erred in this regard.

6          c.  The ALJ Properly Determined That A Lack Of Objective Medical

7             Evidence Undermined Plaintiff's Credibility

8   The ALJ also discredited plaintiff's testimony due in part to a lack of objective medical

9   evidence supporting that testimony.  (AT 26.)

10   "[A]fter a claimant produces objective medical evidence of an underlying impairment, an

11   ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence

12   to fully corroborate the alleged severity of pain."  Burch, 400 F.3d at 680 (citing Bunnell, 947

13   F.2d at 345).  However, although lack of medical evidence cannot form the "sole" basis for

14   discounting plaintiff's subjective symptom testimony, it is nevertheless a relevant factor for the

15   ALJ to consider.  Id. at 680-81 (ALJ did not err in relying in part upon the record's "minimal

16   objective evidence" in discounting plaintiff's testimony because ALJ also "made additional

17   specific findings" regarding plaintiff's activities of daily living, lack of consistent treatment, and

18   failure to seek treatment, all of which supported the adverse credibility determination).

19   Here, the record supports the ALJ's finding that plaintiff's allegations of disabling pain

20   were inconsistent with the examining physicians' observations and were not supported by the

21   medical evidence of record.  As the ALJ noted, contrary to plaintiff's representations of total

22   disability, the record reveals no evidence of any "ongoing inflammation" of plaintiff's joints (AT

23   26), no evidence of more than "mild" carpal tunnel syndrome despite plaintiff's complaints of

24   ongoing arm numbness/pain (AT 22), and no evidence of knee effusion or abnormality despite

25   plaintiff's complaints of knee pain (AT 23).  The ALJ also described various test results,

26   including a CT scan of plaintiff's spine, an x-ray of plaintiff's right knee, and tests of

27   motion/sensation/reflexes.  (AT 23, 26.)  As the ALJ accurately noted, these results were all

28   within normal ranges or showed no significant abnormalities.  (AT 23, 26.)  The ALJ concluded

1    that, even accepting plaintiff's testimony regarding her "back or joint pain" (AT 22, 26), the lack

2    of objective evidence of *other* impairments affecting such pain would not "preclude her from

3    performing medium exertional work."  (AT 26.)

4           Plaintiff also argues that some medical evidence of record supports plaintiff's complaints

5    of right hand numbness and mental impairments.  (Mot. for Summ. J. at 10-12 (citing record

6    evidence of plaintiff's "carpal tunnel" diagnosis and GAF scores).)  However, the existence of

7    *some* objective evidence bolstering *some* of plaintiff's testimony does not necessarily render the

8    ALJ's adverse credibility determination erroneous.  The issue is whether the ALJ's credibility

9    finding is supported by substantial evidence in the record, and the court "may not engage in

10   second-guessing."  Thomas, 278 F.3d at 959.  In other words, the issue is whether the reasons the

11   ALJ gave for his adverse credibility decision find support in the record, and in this particular

12   case, they do.

13          Plaintiff also focuses on test results for her back and spine and suggests that the ALJ

14   minimized the severity of those results in rendering his adverse credibility determination.  (Reply

15   at 3.)  However, even if these test results were "not the mild results that the ALJ and Defendant

16   assert," and even if the test results prove "clear severity" as plaintiff contends (Reply at 3),

17   plaintiff has not explained how this would render the ALJ's credibility determination erroneous.

18   Again, the fact that *some* objective evidence might support *some* of plaintiff's testimony does not

19   render the ALJ's credibility analysis erroneous.  In any event, however, the medical opinions of

20   record did not find the sort of "clear severity" plaintiff describes.  (AT 290-91, 303.)  Despite

21   plaintiff's allegations of pain related to her back and spine, the medical opinions of record

22   indicate that plaintiff nevertheless retained the physical ability to perform "medium" work.  (E.g.,

23   AT 25, 290-91 (opining that plaintiff's back impairments limited her to "medium" work), 303.)

24   Thus, the test results potentially support some degree of resulting pain or functional limitation but

25   not necessarily the degree of "constant" pain plaintiff alleges.  (AT 26.)

26          Accordingly, plaintiff has not shown that the ALJ erred in relying in part upon a lack of

27   supporting objective medical evidence as one of the several reasons he offered for discounting

28   plaintiff's testimony.

d.   The ALJ Properly Determined That Plaintiff's Activities Of Daily Living
Undermined Her Credibility

"While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . . Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1112-13 (citations and quotation marks omitted); see also Burch, 400 F.3d at 680 (ALJ properly considered claimant's ability to care for her own needs, cook, clean, shop, interact with her nephew and boyfriend, and manage finances in the credibility analysis); Morgan, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility).

Here, the ALJ found that plaintiff has "no limitation" on her "activities of daily living and social functioning." (AT 20.) As the ALJ noted, plaintiff testified "that she is capable of performing household duties, such as cooking, cleaning, and laundry. She goes grocery shopping four to five times a month, goes to church, walks [her] dog for exercise and watches television." (AT 21.) Dr. Cormier also found that that plaintiff "was capable of performing basically all activities of daily living" except managing funds due to "limited mathematical skills." (AT 21, 24, 283.) The ALJ found that plaintiff's "described daily activities [] are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AT 26.)

Accordingly, the ALJ did not err in reasoning that plaintiff's daily activities tend to undermine plaintiff's testimony regarding her disabling symptoms and limitations. See Burch, 400 F.3d at 680; Morgan, 169 F.3d at 600. Plaintiff has not shown that the ALJ erred in discounting plaintiff's testimony in part upon the basis of her activities of daily living.

e.   The ALJ Properly Determined That Plaintiff's Relatively Effective Use Of
Medications Undermined Her Credibility

The ALJ also discredited plaintiff's testimony in part because plaintiff's "medical records

15

1   reveal that [her] medications have been relatively effective in controlling the claimant's

2   symptoms." (AT 26.)  A condition that can be controlled or corrected by medication is not

3   disabling for purposes of determining eligibility for benefits under the Act.  Warre v. Comm'r of

4   Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled

5   effectively with medication are not disabling for the purpose of determining eligibility . . . .").[7]

6        The evidence of record supports the ALJ's determination that medications have been

7   relatively effective in controlling plaintiff's symptoms.  (AT 26 (citing AT 342-55).)  On March

8   23, 2009, plaintiff received treatment at Shasta County Mental Health for an annual medical

9   evaluation, during which she reported increased anxiety and depression due to "several deaths in

10   [her] family." (AT 25, 343-45.)  However, as the ALJ noted, the records indicate that at that

11   time, plaintiff "had not been medication compliant and was not taking her Cymbalta due to

12   increasing anxiety caused by several deaths in the family." (AT 25, 343-45.)

13       Shortly thereafter, on April 8, 2009, plaintiff went to a follow-up appointment at Shasta

14   County Mental Health and reported that she "lost 2 friends recently plus [her] mother [and] uncle

15   in December and January." (AT 349.)  However, plaintiff also reported that "Seroquel is helping

16   her sleep" and that her "anxiety has greatly decreased and [she] is getting out a little more." (AT

17   349.)  She was considered "stable on current medications" and rated as having a "good" response

18   to her medications.  (AT 350.)  The ALJ specifically noted that, "by April 2009, [plaintiff] was

19   stable on current medications, her sleep was improving, and her anxiety had greatly decreased

20   and she was getting out more." (AT 25 (citing AT 342-53).)  Accordingly, plaintiff has not

21   shown the ALJ erred in discounting plaintiff's credibility in part because medications controlled

22

23   ――――――――――――――――
     [7]   An ALJ is required to consider, but permitted to discredit, a claimant's allegations of a
24   medication's side effects.  Berry v. Astrue, 622 F.3d 1228, 1235 (9th Cir. 2010).  Plaintiff's
     moving papers do not discuss any particular alleged side effects of plaintiff's medications, but
25   plaintiff argues in passing that the ALJ's decision did not properly address potential side effects
     of her medications.  (Reply at 4.)  However, plaintiff has not identified evidence suggesting that
26   any of plaintiff's medications have side effects.  Evidence of record indicates that plaintiff's
     medications work well and do not cause significant side effects.  (E.g., AT 349-50.)  The
27   evidence in the record thus supports the ALJ's decision to discount plaintiff's credibility in part
     because medications controlled her symptoms relatively effectively, and the ALJ did not err by
28   not addressing "side effects" that plaintiff's own briefing fails to meaningfully address.

1   her symptoms relatively effectively.

2          Plaintiff also argues that her low GAF scores show her medications were ineffective, but

3   that argument is not well-taken for the reasons described below.

4                    f.   Plaintiff Has Not Shown That The ALJ Erred With Respect To Plaintiff's

5                         GAF Scores

6          Plaintiff argues that her GAF scores "support[] a finding of disability" and that the ALJ

7   erred in not discussing them.  (Mot. for Summ. J. at 11, 13 (citing cases).)  Plaintiff argues that

8   the ALJ "fail[ed] to even acknowledge Plaintiff's GAF scores of 40 and 45 anywhere in the

9   decision."  (Id. at 12 (citing AT 220, 344, 372); Reply at 4.)  Plaintiff also argues that the ALJ's

10  finding that medications were "relatively effective" is undermined by evidence showing that

11  plaintiff's GAF scores ranged as low as 40 despite her medications.  (Reply at 4.)  Plaintiff

12  essentially argues that while medication may have helped control her symptoms, it did not

13  significantly help to raise her GAF scores, so the ALJ must have erred in deeming the

14  medications effective.

15                    1.   Plaintiff Has Not Shown That The ALJ Had To Specifically

16                         Address Plaintiff's GAF Scores

17         Plaintiff has not compellingly shown that an ALJ errs by failing to specifically discuss

18  GAF scores.  The two district court cases plaintiff cites, Hamilton and Dempster, do not

19  compellingly support plaintiff's argument.  (Mot. for Summ. J. at 13 (citing Hamilton v. Astrue,

20  No. ED CV 08-444-PLA, 2009 WL 482330, at *5 (C.D. Cal. Feb. 24, 2009) (unpublished);

21  Dempster v. Astrue, No. ED CV 07-503-PJW, 2008 WL 4381541, at *2 (C.D. Cal. Sept. 23,

22  2008) (unpublished)).)

23         In Dempster, the court cited the "general rule" that "an ALJ is not required to rely on GAF

24  scores in formulating his decision."  Dempster, 2008 WL 4381541 at *2 (citing Howard v.

25  Comm'r of Social Security, 276 F.3d 235, 241 (6th Cir. 2002)).  Yet plaintiff's brief makes no

26  mention of this "general rule," and does not meaningfully analogize to the facts of Dempster.

27  (Mot. for Summ. J. at 13.)  Further, while the court in Dempster noted that "arguably, GAF scores

28  can be probative of a claimant's mental health on a given day and should be at least

acknowledged by the ALJ," the court also noted that "[w]ere [p]laintiff's sole complaint that the ALJ failed to discuss the GAF scores, the Court would not send the matter back to the ALJ for reconsideration of this issue."  Id.  The court in Dempster did not hold that an ALJ's failure to address GAF always amounts to legal error, but remanded instead on other grounds and encouraged the ALJ to discuss GAF scores on remand.  Id.  Similarly, in Hamilton, the court did not make any specific finding regarding the plaintiff's GAF scores argument and remanded for other reasons, but instructed the ALJ to "address the relevance of the GAF scores in the medical record" when readdressing other issues.  Hamilton, 2009 WL 482330 at *5.  Plaintiff has not shown that either Dempster or Hamilton are meaningfully analogous to the facts in this case, and has not shown that either Dempster or Hamilton require an ALJ to discuss GAF scores in his decision.[8]

The Commissioner argues (Opp'n at 2) that "[t]he GAF scale, which is . . . endorsed by the American Psychiatric Association[,] does not have a direct correlation to the severity requirements in our mental disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746–01 (Aug. 21, 2000).[9]  In other words, the GAF scores provide only a "very rough outline of a claimant's ability to function."  LoPresto v. Colvin, No. CV–12–00739–PHX–GMS, 2013 WL 1628727, at *7-8 (D. Ariz. April 16, 2013) (unpublished).

---

[8]   While plaintiff also cites to Sousa, plaintiff does not compellingly analogize to that case, and Sousa does not address the issue of whether an ALJ necessarily errs by not discussing GAF scores.  (Mot. for Summ. J. at 11, 13 (citing Sousa v. Chater, 945 F. Supp. 1312, 1326 (E.D. Cal. 1996), rev'd, 143 F.3d 1240 (9th Cir. 1998)).)

[9]   "We did not mention the GAF scale to endorse its use in the Social Security and SSI disability programs, but to indicate why the third sentence of the second paragraph of proposed 12.00D stated that an individual's medical source 'normally can provide valuable additional functional information.'  To assess current treatment needs and provide a prognosis, medical sources routinely observe and make judgments about an individual's functional abilities and limitations. The GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association.  It does not have a direct correlation to the severity requirements in our mental disorders listings."  65 Fed. Reg. 50746-01 at *50764-65.

Moreover, the Ninth Circuit Court of Appeals has rejected plaintiff's argument that an ALJ must discuss GAF scores. In <u>Doney</u>, the plaintiff argued "that the ALJ failed to set forth clear and convincing reasons for rejecting her treating psychologist's assignment of her Global Assessment of Functioning ("GAF") score." <u>Doney v. Astrue</u>, 485 Fed. Appx. 163, 165, 2012 WL 2584837, at *2 (9th Cir. July 5, 2012) (unpublished).[10] The court in <u>Doney</u> held "that it was not error for the ALJ to disregard [plaintiff's] GAF score." <u>Id.</u> In rejecting the plaintiff's argument, the Court of Appeals clarified that "[t]his court, however, has recognized that '[t]he Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.'" <u>Id.</u> (citing <u>McFarland v. Astrue</u>, 288 Fed. Appx. 357, 359 (9th Cir. 2008) (some alterations in <u>McFarland</u>) (quoting 65 Fed. Reg. 50,746, 50,765 (Aug. 21, 2000))).

Similarly, in <u>McFarland</u>, the plaintiff argued "that the ALJ erred by failing to consider three of the plaintiff's GAF scores of 50. <u>McFarland</u>, 288 Fed. Appx. at 359. The Court of Appeals first clarified that "[t]he Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.'" <u>Id.</u> (citing 65 Fed. Reg. 50, 746, 50,765 (Aug. 21, 2000)). The Court of Appeals then concluded that it was not legal error for the ALJ to fail to explicitly address the GAF scores within his decision. <u>Id.</u> Specifically, the court noted that the ALJ's RFC assessment "took into account [plaintiff's] mental impairments, was not inconsistent with [plaintiff's] three limited duration GAF scores, and was supported by substantial evidence in the record." <u>Id.</u>

Other courts have also rejected the argument that an ALJ must discuss GAF scores. <u>See</u>, <u>e.g.</u>, <u>Howard</u>, 276 F.3d at 241 ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); <u>Speelman v. Astrue</u>, No. EDCV 09-1222 CW, 2010 WL 3001664, at *4 (C.D. Cal. July 29, 2010)

---

[10] Although <u>Doney</u> and <u>McFarland</u> are unpublished decisions and thus only of persuasive value, they are cited herein pursuant to Ninth Circuit Rule 36-3, which provides that "[u]npublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

1    (unpublished) (explaining that "[a]n ALJ does not commit legal error by failing to incorporate a

2    GAF score into his disability assessment" and holding that ALJ's failure to discuss a GAF score

3    assigned by a treating physician was not legal error).  Accordingly, plaintiff has not shown that

4    the ALJ erred by not discussing GAF scores in this particular case.

5         Further, even assuming arguendo that the ALJ erred, any error arising from the ALJ's

6    omission is harmless because it did not impact the ALJ's ultimate disability determination.  See

7    Stout, 454 F.3d at 1055 ("We have also affirmed under the rubric of harmless error where the

8    mistake was . . . irrelevant to the ALJ's ultimate disability conclusion.").  In this case, the GAF

9    scores in the record fluctuated between 40 and 75 between 2008 and 2009 as described above,

10   and even if the ALJ should have discussed the GAF scores, plaintiff has not shown that evidence

11   of her lower scores should be afforded more weight than evidence of her higher scores.  In other

12   words, while the record reveals some GAF scores below 51[11], the record *also* reveals higher GAF

13   scores[12], and substantial evidence supports the ALJ's decision that plaintiff's mental impairments

14   did not render her totally disabled.

15         2.   Plaintiff's GAF Scores Do Not Undermine The ALJ's Findings

16              Regarding Plaintiff's Use Of Medication

17        Plaintiff has not cited any authorities indicating that a medication cannot be considered

18   "relatively effective" in controlling mental symptoms unless it elevates a patient's GAF scores.

19   Absent such authorities, plaintiff has not compellingly supported her argument.  Moreover,

20   contrary to plaintiff's suggestion, the record does not show that plaintiff consistently obtained

21   lower GAF scores despite being on the *appropriate dosage* of the appropriate medications.  (E.g.,

22   AT 345 (plaintiff prescribed 60 mg/day of Cymbalta on March 23, 2009); AT 349-50 (noting

23   plaintiff's "anxiety has greatly decreased" and that she is "getting out a little more" and that she is

24   "stable on current medications," including 60 mg/day of Cymbalta on April 8, 2009).)

---

25   [11]   (AT 371-72 (GAF of 40 on August 6, 2008); AT 216-20 (GAF of 40 on September 17, 2008);
26   AT 343-44 (GAF of 45 on March 23, 2009).)

27   [12]   (AT 281-83 (GAF of 55 on January 9, 2009); AT 283 (GAF of "75" for the "past year" on
     January 9, 2009); AT 305 (GAF of 60 on January 19, 2009).)
28

1    Plaintiff is correct that the record indicates plaintiff's GAF scores fluctuated between 40

2    and 60 from 2008 to 2009.  (AT 371-72 (GAF of 40 on August 6, 2008); AT 216-20 (GAF of 40

3    on September 17, 2008); AT 281-83 (GAF of 55 on January 9, 2009); AT 305 (GAF of 60 on

4    January 19, 2009); AT 343-44 (GAF of 45 on March 23, 2009).)  On January 9, 2009, Dr.

5    Cormier noted that plaintiff's GAF score was "75" for the "past year."  (AT 283.)

6    However, that same record also confirms that plaintiff's lowest GAF scores generally

7    came from periods where she was not taking the correct medications, was taking incorrect

8    dosages, or was struggling to cope with the deaths of family members.  (E.g., AT 371-72 (noting

9    GAF of 40 on August 6, 2008, but *also* noting that plaintiff's anxiety had increased because her

10   Cymbalta had accidentally been discontinued at the pharmacy, and that plaintiff's medical visit

11   was specifically so that she could request that her Cymbalta be re-prescribed for twice-a-day

12   doses because that dosage made her anxiety "much better"); AT 216-20 (noting GAF of 40 on

13   September 17, 2008, but *also* noting that plaintiff herself reported that unidentified "prescribed

14   medications" from a clinic doctor were "not working"); AT 343-45 (noting plaintiff's "current"

15   GAF of 45 on March 23, 2009, but *also* noting that plaintiff's anxiety was increased due to

16   "several deaths in family" and that plaintiff herself reported that "Cymbalta controls [her]

17   anxiety," such that plaintiff's prescribed Cymbalta dosage was increased).  On this evidence,

18   plaintiff has not shown that her lower GAF scores reveal a medication-related failure to control

19   her symptoms.   Instead, plaintiff's GAF scores actually lend support to the ALJ's finding that the

20   medications were "relatively effective" in controlling plaintiff's symptoms, because the record

21   confirms that *with the proper dose of the proper medication*, plaintiff's GAF scores remained

22   fairly stable and often within the range of "moderate" symptoms (GAF of 51-60).  (AT 281-83

23   (GAF of 55 on January 9, 2009, while on 50 mg/day of Cymbalta); AT 305 (GAF of 60 on

24   January 19, 2009, while "current medications included Cymbalta").)

25   Further, evidence of record — evidence other than GAF scores — indicates plaintiff's

26   medications helped her symptoms of anxiety.  (E.g., AT 349-50 (noting plaintiff's "anxiety has

27   greatly decreased," that she is "getting out a little more," and that she is "stable on current

28   medications," including 60 mg/day of Cymbalta on April 8, 2009); AT 371-72 (on August 6,

1  2008, plaintiff's medical visit was specifically so that she could request that her Cymbalta be re-

2  prescribed for twice-a-day doses because that dosage made her anxiety "much better"); cf. AT

3  350-51 (on February 17, 2009, plaintiff reported she was "not doing well" while off her Cymbalta

4  for a week).)

5          The record thus contains substantial evidence supporting the ALJ's conclusion that

6  medications have been relatively effective in controlling plaintiff's symptoms.  See Thomas, 278

7  F.3d at 954.  Because effective symptom control through medication is a valid reason for

8  rejecting claimant testimony, and there is substantial evidence to support the ALJ's

9  determination, the ALJ had a proper basis to discount plaintiff's testimony.

10                    g.  Plaintiff Has Not Shown That The ALJ Failed To Address Plaintiff's Right

11                        Hand Impairment

12          Plaintiff argues that "the ALJ never cited any evidence to address the validity of

13  Plaintiff's testimony regarding her right dominant hand impairment."  (Mot. for Summ. J. at 12.)

14  Plaintiff essentially argues that the ALJ's credibility analysis was flawed because the ALJ did not

15  specifically mention plaintiff's right hand impairment as part of that analysis.  (Id. at 13, Reply at

16  2.)  The argument that the ALJ failed to specifically "address the validity of" plaintiff's testimony

17  about her carpal tunnel syndrome is not well-taken.

18          The ALJ did not specifically discuss plaintiff's right hand impairment in the context of his

19  adverse credibility determination.  Plaintiff, however, has not cited any authorities indicating that

20  this amounts to error.  Plaintiff has not compellingly shown that, in rendering a credibility

21  determination, an ALJ must itemize each and every alleged impairment and explain why the

22  testimony given about each and every particular impairment was less than credible.  To the

23  contrary, an ALJ's credibility assessment requires the ALJ to analyze the record as a whole, to

24  use "ordinary techniques of credibility evaluation" and to give "specific, clear, and convincing

25  reasons" for his or her assessment.  Molina, 674 F.3d at 1112-13.  Accordingly, plaintiff has not

26  shown that the ALJ erred by failing to specifically mention plaintiff's right hand impairment

27  ////

28  ////

1    when assessing plaintiff's credibility.[13]

2         To the extent plaintiff makes the same argument for impairments other than plaintiff's

3    right arm impairment (see Mot. for Summ. J. at 10-11 (discussing evidence of particular mental

4    impairments)), the argument fails for the same reasons.  In short, while plaintiff might produce

5    *some* evidence bolstering her testimony regarding her right arm impairment and mental

6    impairments, the existence of *some* bolstering evidence does not render the ALJ's credibility

7    determination erroneous.  For the reasons stated above herein, the ALJ gave valid reasons for his

8    credibility decision, and those reasons are supported by the substantial evidence of record.

9              h.   Plaintiff Has Not Shown That The ALJ Erred in Failing To Consider Other

10                  Treatments And Similar Issues

11        Plaintiff argues that the ALJ failed to consider the plaintiff's daily activities, the side

12   effects of plaintiff's medications, plaintiff's other treatments, and the like when rendering his

13   credibility determination.  (Reply at 3-4 (citing SSR 96-7p).)  However, plaintiff makes this

14   argument in passing and fails to identify which specific daily activities, side effects, other

15   treatments, etc., the ALJ *should have considered*.  Plaintiff also fails to explain how such any

16   evidence, if it had been considered, would have actually made a difference in the outcome

17   plaintiff's case.  (Id.)  Because plaintiff has not herself compellingly described any such evidence

18   and none appears on the undersigned's review of the record, even if the ALJ erred by failing to

19   discuss such evidence, the error was at most harmless.  See Curry v. Sullivan, 925 F.2d 1127,

20   1129 (9th Cir. 1990) (harmless error analysis applicable in judicial review of social security

21   cases); Molina, 674 F.3d at 1115 (harmless error when ALJ provided one or more invalid reasons

22   for disbelieving a claimant's testimony, but also provided valid reasons that were supported by

23   the record); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195-97 (9th Cir. 2004)

24   (ALJ's erroneous assumption was harmless "in light of all the other reasons" validly given by the

---

26   [13]   Incidentally, it cannot be said that the ALJ erroneously "ignored" evidence of plaintiff's
27   carpal tunnel syndrome, if that is what plaintiff intends to argue.  Indeed, the ALJ specifically
     relied upon plaintiff's "mild carpal tunnel" diagnosis in rendering his RFC assessment, finding
     that the medical opinion evidence of record supported limiting plaintiff to "medium" work despite
28   that diagnosis.  (AT 25, 205-10, 291.)

1    ALJ for his credibility determination, and supported by the evidence of record).

2          Relatedly, plaintiff argues that the ALJ had a heightened obligation to develop the record

3    with respect to plaintiff's daily activities, the side effects of plaintiff's medications, plaintiff's

4    other treatments, and the like, because plaintiff was represented by a non-attorney during the

5    hearing.  (Reply at 4.)  While plaintiff is correct that an ALJ "has a special duty to develop the

6    record fully and fairly and to ensure that the claimant's interests are considered, even when the

7    claimant is represented by counsel," plaintiff has not shown that the ALJ failed to develop the

8    record in this particular case.  (Id. (citing Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).)

9    As the court in Mayes noted, it is the plaintiff's "duty to prove that she was disabled," and she

10   cannot "shift her own burden to the ALJ" by virtue of the ALJ's duty to develop the record.

11   Mayes, 276 F.3d at 459.  "An ALJ's duty to develop the record further is triggered only when

12   there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of

13   the evidence."  Id. (citing Tonapetyan, 242 F.3d at 1150).

14         Here, the record was neither ambiguous nor inadequate to allow for proper evaluation of

15   the evidence.  Substantial evidence supports the ALJ's decision that plaintiff gave less-than-

16   credible testimony.  Plaintiff's own briefing does not state what evidence of particular side

17   effects, daily activities, other treatments, etc., would have made any difference in the ALJ's

18   credibility analysis, let alone what the ALJ should have done to further develop the record.

19   Absent such explanation, plaintiff's argument improperly shifts her burden onto the ALJ.

20              i.   Even If The ALJ Erred By Observing That Plaintiff Sought Medical

21                   Attention Primarily To Obtain Benefits, Such Error Was Harmless

22         Plaintiff also argues that the ALJ's credibility determination was erroneous because the

23   ALJ improperly focused on the fact that plaintiff may have seen doctors to obtain evidence for

24   her benefits claim.  (Mot. for Summ. J. at 13.)  The ALJ did note that plaintiff may have been

25   "seeing physicians primarily in order to generate evidence for" her disability application.  (AT

26   26.)  Yet the ALJ gave various other valid, record-supported reasons for his adverse credibility

27   determination as described above.  Therefore, to the extent the ALJ erred by observing that

28   plaintiff sought medical attention for purposes of obtaining benefits, such error was harmless.

1    See Molina, 674 F.3d at 1115 (harmless error when ALJ provided one or more invalid reasons for

2    disbelieving a claimant's testimony, but also provided valid reasons that were supported by the

3    record).

4                    C.   Substantial Evidence Supports The RFC Assessment

5                         a.   Plaintiff Has Not Shown That The ALJ's RFC Assessment Fails To

6                              Account For Plaintiff's Functional Limitations

7        While the ALJ's RFC assessment limits plaintiff to medium, simple, unskilled work,

8    plaintiff argues that such limitation is insufficient.  (Mot. for Summ. J. at 14-15.)  Plaintiff argues

9    that "the medical record does not support the ALJ's RFC finding that Plaintiff could perform

10   medium work as long as it is 'simple.'"  (Id. at 15.)  Plaintiff's argument is based upon Dr.

11   Cormier's opinion regarding plaintiff's functional limitations.  The ALJ gave "significant weight"

12   to Dr. Cormier's opinion, along with the other opinions of record, despite "slight variations" in

13   those opinions.  (AT 26.)

14       Dr. Cormier opined, in pertinent part, as follows: that plaintiff's ability to maintain regular

15   attendance and perform work activities on a consistent basis may be "impaired;" that plaintiff has

16   "moderate" limits on "persistence but not pace;" that plaintiff can perform "basically all activities

17   of daily living;" and that plaintiff's history "suggest[s] impairment" in her current ability to deal

18   with the typical stresses that she may encounter in a competitive work environment.  (AT 283.)

19   Dr. Cormier also opined that plaintiff's ability to perform simple tasks and complete the workday

20   without interruptions fell somewhere between "moderately" and "seriously" limited.  (Id.)  Dr.

21   Koretzky gave essentially the same opinion, with the "slight variation" being that that plaintiff

22   had no more than "moderate" limitations.  (AT 316, 320-21.)

23       To the extent the ALJ erred in failing to specifically discuss Dr. Cormier's "moderate to

24   serious" phraseology in reference to plaintiff's RFC, however, such error was harmless because

25   substantial evidence supports characterizing plaintiff's limitations as "moderate."  The issue is

26   whether the ALJ's RFC assessment is supported by substantial evidence, and for the reasons

27   described below, it is.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008);

28   Brink v. Astrue, No. 3:12–cv–01131–MA, 2013 WL 1785803, at *5 (D. Or. April 24, 2013)

1    (unpublished) (on appeal after remand, addressing "moderate" limitations and explaining that

2    "[t]he dispositive inquiry is whether the ALJ's RFC assessment is supported by substantial

3    evidence.")

4                    1.   Dr. Cormier's Opinion Regarding "Moderate To Serious" Limitations

5            Plaintiff argues that the ALJ's RFC assessment improperly fails to incorporate plaintiff's

6    "moderate to serious" limits on ability to perform simple tasks and ability to complete the

7    workday or workweek without interruptions.  (Mot. for Summ. J. at 13-15; Reply at 6-7; AT 283.)

8    Plaintiff also argues that an RFC assessment limiting plaintiff to "medium, simple, unskilled"

9    work fails to incorporate several other limitations described in Dr. Cormier's opinion, albeit ones

10   Dr. Cormier himself described as no more than generally "impaired" or "moderate."  (Mot. for

11   Summ. J. at 13-15.)

12           Even if the ALJ erred by failing to explicitly discuss Dr. Cormier's "moderate to severe"

13   phraseology, it cannot be said that the ALJ's RFC assessment is contrary to substantial evidence.

14   A "moderate to serious" limitation does not necessarily mean a "serious" limitation.  However,

15   even if Dr. Cormier intended to characterize plaintiff's limited abilities to perform "simple" tasks

16   and to complete the workday without interruptions as being on the "serious" end of the spectrum,

17   the evidence of record undercuts this characterization.  First, Dr. Cormier examined plaintiff

18   shortly after two deaths in her family, and Dr. Cormier himself emphasized that those deaths

19   heavily impacted the degree of functional limitations apparent on the day of the examination.

20   (AT 24, 283.)  As the ALJ noted, Dr. Cormier ultimately minimized his own preceding findings

21   by concluding them with the following sentence: "I suspect that [plaintiff's] functional status may

22   significantly improve within the next few months with continuing counseling and

23   pharmacological treatment, given the recentcy [sic] of her losses of her mother and sister."  (AT

24   24, 283.)  In short, in this case the examining physician himself explained away his own opinions,

25   including those regarding "moderate to serious" limitations.  Further, evidence of record reveals

26   that about a week after his first examination, Dr. Cormier in fact did re-examine plaintiff and he

27   opined that her functional limitations were indeed "significantly better" and that her mental test

28   results were "unremarkable" or showed only "mild" impairment.  (E.g., AT 305 (Dr. Koretzky's

1    notes summarizing Dr. Cormier's supplemental examination results).)

2         Given the foregoing, Dr. Cormier did not ultimately opine that plaintiff has "serious"

3    mental functional limitations.  Dr. Cormier's first opinion regarding plaintiff's functional

4    limitations was undercut by his own conclusion thereto (AT 283) and thereafter by his own

5    supplemental opinion.  (AT 305.)  Further, other medical opinion evidence of record supports

6    assessing plaintiff's various mental functional limitations as no more than "moderate."  (AT 305-

7    23 (Dr. Koretzky's opinion).)

8         Taking the evidence of record as a whole, then, to the extent the ALJ erred in not

9    explicitly addressing Dr. Cormier's "moderate to serious" phraseology, such error was harmless.

10   Substantial evidence of record supports characterizing plaintiff's mental limitations as

11   "moderate."  See Curry, 925 F.2d at 1129 (harmless error analysis applicable in judicial review of

12   social security cases); Molina, 674 F.3d at 1115; Batson, 359 F.3d at 1195-97 (ALJ's erroneous

13   assumption was harmless "in light of all the other reasons" validly given by the ALJ for his

14   credibility determination, and supported by the evidence of record).

15                    2.   "Moderate" Limitations And "Simple" Work

16        Substantial evidence also supports the ALJ's RFC assessment limiting plaintiff to

17   "simple," unskilled work (AT 305).  See Stubbs-Danielson, 539 F.3d at 1174 (holding that

18   "moderate" mental limitations are not necessarily inconsistent with an RFC for "simple" tasks, as

19   long as such an assessment is generally consistent with the "concrete" restrictions identified in the

20   medical evidence).[14]  Plaintiff has not shown that a limitation to medium, simple, unskilled work

21   fails to adequately encompass plaintiff's "moderate" and "impaired" functional limitations as Dr.

22   Cormier characterized them.  (AT 283.)

23

24   _____

[14]   See also Brink, 2013 WL 1785803, at *5 (on appeal after remand, clarifying that "the term

25   'moderate' does not inherently translate to a concrete functional limitation," that "the term
     'moderate' does not necessarily indicate a degree of limitation that must be expressly reflected in

26   the RFC assessment," and that the "dispositive inquiry is whether the ALJ's RFC assessment is
     supported by substantial evidence.") (citing cases, including Bickford v. Astrue, Civil No. 09–

27   833–KI, 2010 WL 4220531, at *11 (D. Or. Oct. 19, 2010) (unpublished) ("so long as the ALJ's
     decision is supported by medical evidence, a limitation to simple, repetitive work can account for

28   moderate difficulties in concentration, persistence or pace") (citations omitted)).

An ALJ may synthesize and translate assessed limitations into an RFC assessment without necessarily repeating each functional limitation verbatim in the RFC assessment.  Stubbs-Danielson, 539 F.3d at 1173-74; see also 20 C.F.R. § 404.1545 (defining RFC as "the most you can still do despite your limitations").  "Moderate" mental limitations are not necessarily inconsistent with an RFC for "simple" tasks, as long as such an assessment is generally consistent with the concrete restrictions identified in the medical evidence.  Stubbs-Danielson, 539 F.3d at 1174; see also Rogers v. Comm'r of Soc. Sec. Admin., No. 11–15575, 2012 WL 2951414, at *2 (9th Cir. July 18, 2012) (unpublished) (moderate impairments assessed on a psychiatric review technique form "in broad functional areas used at steps two and three" did not equate to concrete work-related limitations for the RFC; rather, "the RFC assessment adequately captures restrictions in broad functional areas if it is consistent with the concrete limitations in the medical opinions.").[15]

Here, the ALJ translated plaintiff's condition — including the "moderate" limits on "persistence" and other "moderate" limits and "impaired" abilities — into the only concrete restrictions available to him in the medical opinion evidence: restrictions to "simple, unskilled" work.  See Stubbs-Danielson, 539 F.3d at 1173-74.  Again, as the ALJ accurately noted, Dr. Cormier's opinion and Dr. Koretzky's opinion are generally consistent in that they describe various "moderate" limitations with only "slight" variations.  (AT 26.)  While Dr. Cormier never clarified whether plaintiff could perform "simple" work, any kind of work, or no work given the degree of her various mental limitations, another medical opinion of record did provide concrete clarification on the issue.  Specifically, Dr. Koretzky opined that plaintiff had "moderate" limitations on "maintaining concentration, persistence, or pace," her "ability to understand and remember detailed instructions," her "ability to maintain attention and concentration for extended periods," her "ability to complete a normal workday and workweek . . . and to perform at a consistent pace," and her "ability to respond appropriately to changes in the work setting" — but

---

[15]  The unpublished Rogers case is cited herein pursuant to Ninth Circuit Rule 36-3, which provides that "[u]npublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

1  he also opined that these deficiencies would be accounted for by limiting plaintiff to "simple"

2  work.[16]  (AT 305 (limiting plaintiff to "simple" work), 316, 320-21 (describing various

3  "moderate" functional limitations).)

4      In this particular case the evidence of record is fairly analogous to that in <u>Stubbs-</u>

5  <u>Danielson</u>, where two medical opinions noted several "moderate" mental limitations, but only one

6  of those opinions actually translated those "moderate" deficiencies into a concrete limitation, i.e.,

7  an ability to do "simple" work.  <u>See Stubbs-Danielson</u>, 539 F.3d at 1174.  The Court of Appeals

8  found that the ALJ did not err by incorporating plaintiff's "moderate" persistence/pace limitations

9  into the "concrete restriction" of a limitation to "simple," unskilled work.  <u>See id.</u>  Similarly, here,

10  the "simple" concrete restriction in Dr. Koretzky's opinion evidence supports the ALJ's RFC

11  assessment.  Given Dr. Cormier's ultimate undercutting of his own opinion and his supplemental

12  examination confirming plaintiff's significantly improved functional status, as well as Dr.

13  Koretzky's opinion concluding that plaintiff's mental limitations permitted her to do "simple"

14  work, substantial evidence supports the RFC assessment's limiting plaintiff to "simple" and

15  "unskilled" work.

16      Accordingly, substantial evidence in the record as a whole supports the ALJ's finding that

17  plaintiff's mental limitations were "moderately" impaired, and that plaintiff could perform

18  simple, unskilled work.

19          b.   <u>Plaintiff Has Not Shown That A Limitation To "Simple" Work Renders</u>

20               <u>The Medical Vocational Rules Inapplicable</u>

21      Plaintiff argues that "upon proper incorporation of" plaintiff's mental limitations, "the

22  ALJ would not have been able to utilize the Medical Vocational Rules ("the grids") to find

23  [p]laintiff not disabled since [the mental limitations] would have more than 'little or no effect on

24  the occupational base of unskilled medium work.'"  (Mot. for Summ. J. at 14-15 (citing cases,

25  including <u>Hilliard v. Astrue</u>, No. CIV S-07-1759 KJM, 2009 WL 807461, at *4 (E.D. Cal. March

---

16    Although this opinion comes from a nonexamining physician and is thus entitled to less
weight, it is nonetheless a medical source opinion and the ALJ was free to give it some weight.
20 C.F.R §§ 404.1512 & 404.1527.

1   26, 2009) (unpublished)).)  Plaintiff argues that the limitation to "simple" work does not

2   accommodate plaintiff's impairments, thus rendering the Medical Vocational Rules inapplicable

3   in this case.[17]  (Id. at 15.)

4        An ALJ can use the grids without vocational expert testimony when a non-exertional

5   limitation is alleged because the grids "provide for the evaluation of claimants asserting both

6   exertional and non-exertional limitations."  Hoopai, 499 F.3d at 1075-76 (citing Razey v.

7   Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986)).  But the grids are inapplicable "[w]hen a

8   claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range

9   of work permitted by the claimant's exertional limitations."  Id. (citing Burkhart v. Bowen, 856

10  F.2d 1335, 1340 (9th Cir. 1988)).  Thus, a vocational expert is required only when there are

11  significant and "sufficiently severe" non-exertional limitations not accounted for in the grids.  Id.

12  at 1076.  In other words, the ALJ may rely on the grids even when a claimant has combined

13  exertional and non-exertional limitations, as long as the non-exertional limitations are not so

14  significant as to impact the claimant's exertional capabilities.  Bates v. Sullivan, 894 F.2d 1059,

15  1063 (9th Cir. 1990), overruled on other grounds, Bunnell v. Sullivan, 947 F.2d 341, 342 (9th Cir.

16  1991) (en banc); Cowen v. Commissioner of Social Sec., 400 Fed. Appx. 275, 277, 2010 WL

17  4269295, at* 1 (9th Cir. Oct. 22, 2010) (unpublished) ("If an ALJ finds a claimant's non-

18  exertional limitations do not significantly affect his exertional capabilities, the ALJ may use the

19  medical-vocational guidelines ('the grids') in lieu of calling a vocational expert.").[18]

20  ////

21

22  _____

    [17]  "The Medical–Vocational Guidelines are a matrix system for handling claims that involve

23  substantially uniform levels of impairment." Tackett, 180 F.3d at 1101 (citing 20 C.F.R. pt. 404,
    subpt. P, app 2).  "The Guidelines present, in table form, a short-hand method for determining the

24  availability and numbers of suitable jobs for a claimant. These tables are commonly known as
    'the grids.'  The grids categorize jobs by their physical-exertional requirements and consist of

25  three separate tables-one for each category: '[m]aximum sustained work capability limited to
    sedentary work,' '[m]aximum sustained work capability limited to light work,' and '[m]aximum

26  sustained work capability limited to medium work.'" Id. (citing 20 C.F.R. pt. 404, subpt. P, app.
    2, rule 200.00).

27  [18] The unpublished Landa and Cowen cases are cited herein pursuant to Ninth Circuit Rule 36-3,
    which provide that "[u]npublished dispositions and orders of this Court issued on or after January

28  1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

                                                    30

1    The Ninth Circuit Court of Appeals has held that moderate mental limitations do not

2 require vocational expert testimony.  Hoopai, 499 F.3d at 1077; see, e.g., Landa v. Astrue, 283

3 Fed. Appx. 556, 558, 2008 WL 2565545, at *1 (9th Cir. June 25, 2008) (unpublished) (where the

4 record revealed only "mild or moderate" non-exertional limitations and plaintiff's ability to

5 perform activities of daily living, ALJ did not err in using the grids instead of a vocational expert

6 at step five) (citing Hoopai); Martin v. Astrue, No. 2:12–cv–0033 KJN, 2013 WL 552932, at *9

7 (E.D. Cal. Feb. 13, 2013) (unpublished) ("plaintiff's moderate social functioning limitations were

8 not sufficiently severe to require vocational expert testimony.").

9    In Hoopai, a medical source determined that the claimant was moderately limited in "his

10 ability to maintain attention and concentration for extended periods; his ability to perform

11 activities within a schedule, maintain regular attendance, and be punctual with customary

12 tolerance; and his ability to complete a normal workday and workweek without interruption from

13 psychologically-based symptoms and to perform at a consistent pace without an unreasonable

14 number and length of rest periods."  Hoopai, 499 F.3d at 1075-77.  After the ALJ utilized the

15 grids at step five to determine that the claimant was not disabled, plaintiff contended on appeal

16 that the ALJ was required to seek vocational expert testimony regarding the limitations assessed.

17 Id. at 1075.  The Court of Appeals rejected that argument, holding that such moderate mental

18 limitations were not sufficiently severe to prohibit the ALJ from relying on the grids without the

19 assistance of a vocational expert.[19]  Id. at 1077.  Thus, while plaintiff identifies various

20 "moderate" and "impaired" non-exertional limitations, these limitations are not necessarily so

21 "sufficiently severe" that they "significantly" limit her range of work.  See Hoopai, 499 F.3d at

22 1075-77.

23 ////

24 _____

25 [19]  "We have not previously held mild or moderate depression to be a sufficiently severe non-exertional limitation that significantly limits a claimant's ability to do work beyond the exertional

26 limitation.  As a result, we hold that in this case, substantial evidence supports the ALJ's conclusion that the depression was not a sufficiently severe non-exertional limitation that

27 prohibited the ALJ's reliance on the grids without the assistance of a vocational expert."  Hoopai, 499 F.3d at 1077.

28

1     While plaintiff attempts to distinguish <u>Hoopai</u>, she has not compellingly done so.[20]  For

2 instance, plaintiff argues that "[t]he compounding severity from multiple mental ailments is what

3 led Dr. Cormier to opine that plaintiff has not just moderate limitations like in <u>Hoopai</u>, but

4 moderate to serious impairments."  (Reply at 7.)  However, Dr. Cormier believed plaintiff to have

5 just two "moderate to serious" limitations — a finding undercut by Dr. Cormier himself and by

6 other evidence in the record, as described above — and he never described plaintiff's other

7 limitations as more than "moderate" or "impaired;" in other words, plaintiff's limitations are of

8 the same level of severity as those "moderate" limitations described in <u>Hoopai</u>.  <u>See</u> <u>Hoopai</u>, 499

9 F.3d at 1077.  Further, to the extent plaintiff argues that plaintiff's "multiple mental ailments"

10 render <u>Hoopai</u> distinguishable because the <u>Hoopai</u> plaintiff had only one underlying mental

11 ailment, the argument is not well-taken.  (Reply at 7.)  Regardless of the number of underlying

12 mental diagnoses, both the <u>Hoopai</u> plaintiff and the plaintiff in this case were assessed with

13 several resulting "moderate" mental limitations.  <u>See</u> <u>Hoopai</u>, 499 F.3d at 1077.  Plaintiff has not

14 shown that the applicability of <u>Hoopai</u> turns on the number of underlying mental ailments

15 diagnosed.  Also, contrary to plaintiff's argument, Dr. Cormier's opinion made no mention of

16 "compounding severity from multiple mental ailments."

17     Accordingly, the ALJ did not err in using the grids in this case.  The ALJ properly

18 discredited plaintiff's testimony as described above, and substantial evidence supports the ALJ's

19

20 [20]  Plaintiff also analogizes to the <u>Hilliard</u> case, but that case is distinguishable.  <u>Hilliard</u>, 2009
WL 807461 at *4.  In <u>Hilliard</u>, the ALJ's RFC assessment limited the plaintiff to "unskilled

21 medium work."  <u>Id.</u>  Yet the medical opinions of record provided not only that plaintiff had
"moderate" limitations on performing work activities consistently and on maintaining attendance,

22 but also that plaintiff would not likely "be able to interact appropriately with supervisors on a
consistent basis" and that plaintiff only handle/grasp with her left hand for "two hours."  <u>Id.</u>

23 These limitations were not addressed in the ALJ's RFC assessment, and the district court thus
found error in the ALJ's using the grids instead of a vocational expert.  <u>Id.</u>  In this case, however,

24 there is no evidence that plaintiff had any significant limits on her ability to interact with
supervisors.  Indeed, Dr. Cormier explicitly found no such limitation.  (AT 283.)  Further, the

25 district court in <u>Hilliard</u> did not determine that substantial evidence supported assessing the
plaintiff's various mental limitations as "moderate" rather than "moderate to serious," as the

26 undersigned finds here for the reasons stated above.  The assessments of plaintiff's non-exertional

27 limitations in this case are therefore not to the same degree as those assessed in <u>Hilliard</u>.  <u>See</u>

28 <u>Hilliard</u>, 2009 WL 807461 at *4.

1    finding that plaintiff can perform medium exertional work.  Further, the ALJ specifically found

2    (AT 27) that plaintiff's capacity for medium work was not significantly diminished by her non-

3    exertional (mental) limitations so long as the work was simple and "unskilled."  See Hoopai, 499

4    F.3d at 1077; Stubbs-Danielson, 539 F.3d at 1174; Bates, 894 F.2d at 1063; Landa, 283 Fed.

5    Appx. at 558; Cowen, 400 Fed. Appx. at 277; Martin, 2013 WL 552932 at *9.  If an ALJ finds a

6    claimant's "non-exertional limitations do not significantly affect his exertional capabilities," the

7    ALJ may use the grids in lieu of calling a vocational expert.  See Bates, 894 F.2d at 1063.

8    Therefore, the ALJ correctly used the grids to find that plaintiff was not disabled and that she

9    could perform jobs that exist in sufficient numbers in the national economy.

10           Accordingly, plaintiff has not shown that the ALJ's RFC assessment is unsupported by

11   substantial evidence of record.

12           For the foregoing reasons, IT IS HEREBY ORDERED that:

13           1.   Plaintiff's motion for summary judgment (ECF No. 17) is DENIED.

14           2.   The Commissioner's cross-motion for summary judgment (ECF No. 21) is

15                GRANTED.

16           3.    Judgment is entered for defendant.

17           4.   The Clerk of the Court is directed to close this case.

18           IT IS SO ORDERED.

19   Dated:  September 25, 2013

20                                                      _____

21                                                      KENDALL J. NEWMAN
                                                        UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28